

**NUMBER 13-07-00493-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**ERNESTINE TAMEZ WASHINGTON,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

**On appeal from the 93rd District Court
of Hidalgo County, Texas.**

---

**MEMORANDUM OPINION**

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Justice Rodriguez**

A jury found appellant Ernestine Tamez Washington guilty of third-degree felony theft. *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(5) (Vernon 2003). The 93rd District Court of Hidalgo County sentenced Washington to two years in prison, suspended and probated the sentence over five years, assessed a fine, and ordered Washington to pay restitution. By six issues, Washington contends that the evidence was legally and factually insufficient

to prove, beyond a reasonable doubt, that she possessed the requisite criminal intent to deprive and deceive and that there was permanent deprivation or loss of a major portion of enjoyment or value. We affirm.

BACKGROUND

Washington was employed by Texas Computerized Tax Service[1] (TCTS), a limited liability corporation, in Weslaco, Texas, from December 1993 until her employment was terminated on August 2, 2004. James Kiker, who, along with his wife, owned TCTS, lived in Corpus Christi, Texas and relied on Washington to oversee the day-to-day operations of the business. On March 12, 2004, Kiker suffered an severe heart attack. Kiker spent thirty days in the hospital, after which time he was confined to his recliner at home for nearly six weeks.

After the heart attack, Washington drove from Weslaco to Corpus Christi every two to three weeks to visit Kiker. At some point during his convalescence, Kiker had a discussion with Washington about transferring partial corporate ownership of TCTS to her.[2] No paperwork was ever completed regarding any transfer of ownership.

In April 2004, after her discussion with Kiker regarding the alleged transfer of ownership, Washington went to Ed Payne Motors in Weslaco, Texas and initiated negotiations for the purchase of a Dodge Durango. Her sales representative was Arturo

---

[1] In the record, Texas Computerized Tax Service is referred to interchangeably as Texas Computerized Tax Service and Weslaco Tax Service. For clarity's sake, the Court will refer to the business as Texas Computerized Tax Service or TCTS throughout this opinion. TEX. R. APP. P. 47.1.

[2] The record contains conflicting testimony regarding the exact date of the discussion. The State presented evidence that the discussion took place at Kiker's home, after he returned from the hospital. Washington testified that Kiker made the offer to her on one of her visits while he was still in the hospital.

Other facts regarding the content and tone of the conversation are also in dispute. Washington contends that, in the discussion, Kiker offered her forty-nine percent ownership of the business in exchange for her promise to stay with TCTS; Washington claims she accepted on the spot and tendered her consideration by remaining employed with TCTS. Kiker contends, however, that he did not intend to convey ownership to Washington at the time of the discussion; Kiker claims that his offer to her was intended to be for the future.

2

Aguirre. The facts surrounding the negotiation and eventual sale of the Durango are disputed by the parties,[3] but it is uncontroverted that Washington represented herself as a co-owner of TCTS and that the Durango was eventually financed as a business purchase under Kiker's name. To facilitate the credit check, Washington supplied Ed Payne Motors with Kiker's driver's license number, social security number, and all other information necessary to complete the check. All documents incident to the sale—the purchase order, title application, proof of insurance, customer claim form, odometer disclosure—were placed in an envelope and given to Washington so she could obtain Kiker's signature on each document. Washington eventually returned the signed documents to Ed Payne Motors. Washington admits that she forged Kiker's signature on the documents.

Washington took possession of the Durango and put over 13,000 miles on the vehicle between April 26 and July 20, 2004. On July 20, 2004, Washington towed the Durango to Ed Payne Motors because of mechanical troubles and never returned to pick it up. Washington had purchased the vehicle for $38,549.00; after being returned by Washington, Ed Payne Motors resold the Durango for $24,900.00.

Sometime in July 2004, Kiker received a phone call from the Chrysler Financial Corporation inquiring about delinquent payments on the Durango. This was the first notice Kiker received that the Durango had been financed under his name.

On July 21, 2004, Kiker filed a report with the Weslaco police department complaining that Washington had financed a car under his name without his permission. Washington was arrested on January 18, 2005, and on December 15, 2005, the grand jury indicted her for third-degree felony theft, charging that Washington:

---

[3] Washington contends that Aguirre encouraged her to purchase the Durango as a business transaction and indicated that it was acceptable for Washington to sign Kiker's name to the purchase documents. Aguirre denies that he encouraged Washington or told her that she could sign for Kiker, instead testifying that, after Washington had been denied financing for a personal purchase, she suggested that they finance the Durango as a business purchase because she was a partial owner of TCTS.

on or about the 26th day of April A.D., 2004 . . . in Hidalgo County, Texas, did then and there unlawfully appropriate, by acquiring and otherwise exercising control over, property, to-wit: one Dodge motor vehicle, of the value of $20,000.00 or more but less than $100,000.00, from Arturo Aguirre, the owner thereof, without the effective consent of the owner, and with intent to deprive the owner of the property; and [Washington] acted with the intent to deprive said owner of said property by withholding from said owner said property permanently and for so extended a period of time that a major portion of the value and enjoyment of said property was lost to said owner, and without the effective consent of said owner, in that this consent was induced by deception, to wit: [Washington] created and confirmed, by words and conduct, a false impression of fact, not believing it to be true, that was likely to affect and did affect the judgment of such owner.

Washington pleaded not guilty to the charge, and a jury trial was held on July 19-21, 2006. The jury returned a guilty verdict, and the trial court sentenced Washington to two years in prison, suspended and probated the sentence over five years, assessed a $1,500.00 fine, and ordered Washington to pay $7,500.00 in restitution. This appeal ensued.

## STANDARD OF REVIEW & APPLICABLE LAW

In conducting a legal sufficiency review, we view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

4

In a factual sufficiency review, we view all of the evidence in a neutral light in order to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). The evidence is factually insufficient if: (1) it is so weak that it is clearly wrong and manifestly unjust, or (2) the jury's verdict is against the great weight and preponderance of the available evidence. *Id*. To reverse a jury's verdict as being supported by factually insufficient evidence, we must be able to say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. at 417.

The jury is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979). And "[a]lthough authorized to disagree with the jury's determination even if probative evidence exists which supports the verdict, a reviewing court must give due deference to the fact finder's determinations . . . and will reverse the fact finder's determination only to arrest the occurrence of a manifest injustice." *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003).

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Under a hypothetically correct jury charge, a person commits the offense of third-degree felony theft if she "unlawfully appropriates property with intent to deprive the owner of the property" and "the value of the property stolen is $20,000 or more but less than $100,000 . . . ." TEX. PENAL CODE ANN. § 31.03(a), (e)(5); *see King v. State*, 174 S.W.3d 796, 809 (Tex. App.–Corpus Christi 2005, pet. ref'd). Here, the "[a]ppropriation of property [would be] unlawful if . . . it is without the owner's effective

5

consent." TEX. PENAL CODE ANN. § 31.03(b)(1). "The intent to deprive is determined from the words and acts of the [defendant]." *King*, 174 S.W.3d at 810 (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)).

"Appropriate" is defined as "acquir[ing] or otherwise exercis[ing] control over property other than real property." TEX. PENAL CODE ANN. § 31.01(4)(B) (Vernon 2003). "Deprive means . . . to withhold property from the owner permanently or for so long a period of time that a major portion of the value or enjoyment of the property is lost to the owner . . . ." *Id*. at § 31.01(2)(A). The "owner" of the property is the person with the superior right to possession over the defendant; "'[p]ossession' means actual care, custody, control, or management." *Id*. at §§ 1.07(a)(35)(A), (a)(39) (Vernon 2003). The owner's consent is not effective if it is "induced by deception . . . ." *Id*. at § 31.01(3)(A). "Deception" is defined as "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another . . . and that the [defendant] does not believe is true. *Id*. at § 31.01(1)(A).

## DISCUSSION

In six issues, Washington contends that the State's evidence was legally and factually insufficient to prove her guilty of third-degree felony theft beyond a reasonable doubt.[4] Washington's first, second, and third issues challenge the evidence regarding her

---

[4] Washington's legal sufficiency challenges (her second, third, fifth, and sixth issues) state that Washington's rights under article I, sections thirteen and nineteen of the Texas Constitution and the Fourteenth Amendment of the United States Constitution were violated because of the use of legally insufficient evidence. *See* U.S. CONST. amend. XIV, § 1; TEX. CONST. art. I, §§ 13, 19. However, the Texas Constitution and Fourteenth Amendment do not create separate and distinct legal sufficiency issues. Rather, legal sufficiency review was born out of due process considerations, and by naming the United States and Texas due process clauses in her issues, we conclude that Washington has done no more than cite the legal background of the evidentiary sufficiency principle. *See Jackson*, 443 U.S. at 314, 317-19; *Watson*, 204 S.W.3d at 412; *Swearingen*, 101 S.W.3d at 95. Because the same law applies to all four legal sufficiency issues, we will analyze Washington's second and third issues as one issue and fifth and sixth issues as one issue. *See* TEX. R. APP. P. 47.1.

requisite criminal intent to deprive and deceive. Washington's fourth, fifth, and sixth issues challenge the evidence of permanent deprivation and major loss of enjoyment and value.

## A. Criminal Intent and Deception

First, Washington contends her guilty verdict was supported by both legally and factually insufficient evidence because she believed she was part-owner of Texas Computerized Tax Service and could, therefore, bind the business to a contract. Washington challenges the sufficiency of the State's evidence to prove, beyond a reasonable doubt, Washington's (1) criminal intent to deprive Aguirre of the Durango, and (2) deception, specifically, that she did not believe the false fact that she was part-owner of TCTS, a fact that affected Aguirre's judgment in selling her the Durango. *See* TEX. PENAL CODE ANN. §§ 31.01(1)(A), 31.03(a).

### 1. Legal sufficiency[5]

It is undisputed that Washington signed Kiker's name to the Durango purchase documents she returned to Ed Payne Motors and that she had personal, detailed knowledge of Kiker's weakened and fragile physical condition. The undisputed evidence

---

[5] Washington claims we must address whether this case is actually civil, as opposed to criminal, in nature as a threshold issue. We disagree. It is undoubtedly important that a court distinguish between cases arising out of criminal activity and cases arising out of mere contractual disputes. *See Christensen v. State*, 240 S.W.3d 25, 32 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd); *see also Reed v. State*, No. 13-05-364-CR, 2008 Tex. App. LEXIS 2188, at *5-6 (Tex. App.–Corpus Christi Mar. 27, 2008, no pet.). Indeed, a charge of theft made in connection with a contract requires proof of more than an intent to deprive the owner and appropriation of the property. *See Jacobs v. State*, 230 S.W.3d 225, 229 (Tex. App.–Houston [14th Dist.] 2006, no pet.). However, *Christensen*, *Jacobs*, and *Reed* all involved a contractual dispute-turned-crime between the defendant and victim alleged in the indictment. *See Christensen*, 240 S.W.3d at 32-34; *Jacobs*, 230 S.W.3d at 227-28; *Reed*, 2008 Tex. App. LEXIS 2188, at *1-2. In this case, the theft charges against Washington do not arise from a contract between Aguirre, the victim, and Washington, the defendant. Rather, the contract at issue is the alleged transfer of ownership of TCTS from Kiker to Washington. Here, whether or not a contract was formed between Kiker and Washington and the parties' beliefs regarding contract formation are merely evidence of Washington's intent to deprive and deceive Aguirre. We, therefore, overrule Washington's second and third issues to the extent they involve her claim that we must make a threshold determination on the criminal versus civil question.

also shows that no corporate paperwork had been completed regarding the alleged transfer of TCTS ownership to Washington. Finally, it is undisputed that Washington has over a decade of experience in the tax preparation business and, up until the time he learned of the forgeries, Kiker considered Washington a loyal, trustworthy, and knowledgeable employee.

Kiker testified emphatically that, although he had made the offer of forty-nine percent ownership to Washington, he had no present intent to convey ownership to her at the time of the offer; Kiker insisted that he and his wife were the sole owners of TCTS. There was also testimony by an investigating police officer that Kiker had informed him that the ownership offer was merely a "thought" in Kiker's mind and that Kiker did not believe he had given partial ownership of TCTS to Washington.

Kiker further testified that Washington never informed him that she bought a vehicle at Ed Payne Motors as a business purchase. Kiker stated in his testimony that, when he first saw Washington with the Durango, Washington's expression was that of a "deer caught in the headlights." Kiker testified that, when Washington finally came to tell him about the Durango, she tried to convince him that he had authorized the purchase.

Aguirre testified that Washington had done his taxes in the past and that he considered TCTS a reputable business. Washington acknowledged that she had previously done business with Aguirre; she had prepared his taxes and had bought a car from him in 2001. Aguirre testified that it was Washington's idea to buy the Durango as a business purchase *after* Washington was denied financing for a personal purchase. An investigating police officer further testified that Aguirre told him that, although Ed Payne

8

Motors offered to send the purchase documents directly to Kiker for his signature, Washington insisted on taking the paperwork herself.

On appeal, Washington claims there was legally insufficient evidence of (1) her criminal intent to deprive Aguirre of the Durango, and (2) deception, specifically, that she did not believe the false fact that she was part-owner of TCTS her non-belief, a fact that affected Aguirre's judgment in selling her the Durango. However, based on the evidence presented at trial, a rational jury could have concluded that: Washington admitted to forging Kiker's signature; Washington was without authority to make a business purchase because she was not partial owner of TCTS; Washington did not believe she was a partial owner of TCTS because she was an experienced businessperson who knew that no corporate paperwork had ever been completed to effectuate the transfer of ownership; Washington did not believe she was a partial owner of TCTS because she acted suspiciously when Kiker discovered the car, because she tried to pressure Kiker to admit he had authorized the purchase when she knew he was in poor health, and because she insisted on taking the purchase documents herself rather than allowing the dealership to send them directly to Kiker for his signature; Washington misrepresented her ownership of TCTS to Aguirre after she had been denied financing for a personal purchase; and Washington knew Aguirre would accept her false representation because Aguirre believed TCTS was a reputable business and had done business with Washington in the past.

The "jury may infer intent from any facts which tend to prove its existence . . . ." *King*, 174 S.W.3d at 811. And we look to "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Guevara v. State*, 152

9

S.W.3d 45, 49 (Tex. Crim. App. 2004). We conclude that the "combined and cumulative force" of the above evidence was sufficient to permit the jury to reach a rational decision. *See King*, 174 S.W.3d at 811. Viewing the evidence in the light most favorable to conviction, we hold that there was legally sufficient evidence to prove beyond a reasonable doubt that Washington had the requisite intent to deprive Aguirre of the Durango and did not believe the false fact of her co-ownership of TCTS. *See Hooper*, 214 S.W.3d at 13. Washington's second and third issues are overruled.

    2. Factual sufficiency

    In our factual sufficiency review, we view the evidence neutrally. *See Watson*, 204 S.W.3d at 414-15. So, in addition to the verdict-favorable evidence on which we relied in our legal sufficiency analysis, we will also consider evidence favorable to Washington. *See id*. At trial, Washington produced, as an exhibit, her termination letter, in which Kiker withdrew his offer to give Washington forty-nine percent of TCTS. Washington testified that, when she purchased the Durango from Aguirre, she believed she owned forty-nine percent of the business because she had performed the consideration of remaining as an employee of TCTS. Washington further testified that she had always signed documents for Kiker in the past and had told Kiker of her intent to purchase a car for the business. Washington stated in her testimony that she continued to work for Kiker even after he learned she had forged his signature. Washington also claims that there were inconsistencies in Aguirre's and Kiker's testimony, which negates their credibility; in fact, she claims that Aguirre and Kiker perjured themselves at trial. Washington argues that this evidence proves she could not have had the requisite intent to deprive and did not deceive

10

Aguirre because she believed the purchase of the Durango was a business transaction she had the power to authorize.

Nonetheless, even viewing the evidence in a neutral light, we cannot say the verdict was clearly wrong or manifestly unjust. *See Watson*, 204 S.W.3d at 414-15. The evidence presented by Washington was contradicted by the State's testimony and evidence. Kiker vehemently denied conveying partial ownership to Washington and stated that he never gave Washington permission to sign any documents in his name. *See Beckham*, 29 S.W.3d at 151-52 (holding that conflicts in testimony "do not destroy the sufficiency of the evidence" and that it is the exclusive duty of the jury to resolve contradicting evidence and testimony). We, furthermore, refuse to conclude that Aguirre and Kiker provided false testimony. Witnesses are well within bounds to adjust their testimony during questioning to clarify a prior answer; mere discrepancies in testimony do not amount to perjury. *See* TEX. PENAL CODE ANN. § 37.02 (Vernon 2003) (stating that perjury requires a "false statement under oath" made with the "intent to deceive"); TEX. CODE CRIM PROC. ANN. art. 38.04 (stating that the jury is the sole judge of, among other things, the credibility of witnesses). Washington also claims her continued work for Kiker, after his discovery of the forgeries, proves Kiker continued to trust her and that she had nothing to hide. However, based on this fact alone, we refuse to disturb the jury's verdict; it was neither clearly wrong nor manifestly unjust. *See Swearingen*, 101 S.W.3d at 97 (ruling that "the reviewing court must give due deference to the fact finder's determinations concerning the weight and credibility of the evidence"). There was ample evidence for the jury to find that Washington intended to deprive Aguirre of the Durango and did not believe the false fact that she was

11

a partial owner of TCTS, and we find no objective basis in the record to conclude otherwise. *See Watson*, 204 S.W.3d at 414-15. Washington's first issue is overruled.

B. Permanent Deprivation and Major Loss of Enjoyment or Value

Second, Washington challenges the legal and factual sufficiency of the State's evidence of permanent deprivation and major loss of enjoyment or value. Washington contends her guilty verdict was supported by neither legally nor factually sufficient evidence to prove beyond a reasonable doubt that she permanently withheld property from Aguirre or held the property for so long a period of time that a major portion of the value or enjoyment of the property was lost to Aguirre. *See* TEX. PENAL CODE ANN. § 31.01(2)(A).

Washington's main argument regarding this issue is that the State produced insufficient evidence of deprivation because Aguirre was not the actual owner of the Durango. Washington claims that Ed Payne Motors was the entity that suffered the deprivation and that there was no evidence that Aguirre personally experienced any deprivation or loss. Washington's argument misses the mark.

For purposes of theft, the "owner" is a person who has "a greater right to possession [of the stolen property] than the [defendant]." *See* TEX. PENAL CODE ANN. § 1.07(a)(35)(A) (Vernon 2003). When the victim of a crime is a corporation, it is the standard and better practice for the indictment to allege special ownership in a natural person. *Simpson v. State*, 648 S.W.2d 1, 2 (Tex. Crim. App. 1983); *see, e.g., Jackson v. State*, 270 S.W.3d 649, 656-57 (Tex. App.–Fort Worth 2008, pet. ref'd); *Ray v. State*, 106 S.W.3d 299, 301 (Tex. App.–Houston [1st Dist.] 2003, no pet.); *Harris v. State*, 986 S.W.2d 619, 625 (Tex. App–Tyler 1997, pet. ref'd). A car salesman, in particular, has been held as the proper natural person in which to allege special ownership. *See Jackson*, 270 S.W.3d at 657.

Here, Aguirre, as a salesman for Ed Payne Motors, had a greater right to possession of the Durango than Washington and was, therefore, an appropriate person to be named as victim in the indictment.[6]  *See id.*

Concluding that Aguirre was the proper party to be alleged as victim, we proceed to Washington's argument that the State produced insufficient evidence to prove permanent deprivation or a major loss of a portion of value or enjoyment of the property. At the outset, we must note that the State was not required to prove actual deprivation in order to prove Washington's intent to deprive Aguirre; in other words, the deprivation element necessary to prove the offense of theft requires only an intent to deprive, not actual deprivation.[7]  *Rowland v. State*, 744 S.W.2d 610, 612 (Tex. 1988) (en banc).  As previously discussed, the State adduced both legally and factually sufficient evidence to prove, beyond a reasonable doubt, Washington's intent to deprive Aguirre of the Durango.

---

[6]  Washington also contends that there was a fatal variance in the indictment, which alleged Aguirre as owner, because the State did not prove any loss to Aguirre at trial.  As discussed above, it is standard pleading practice to allege special ownership in a person when the victim is a corporation.  *See Simpson v. State*, 648 S.W.2d 1, 2 (Tex. Crim. App. 1983); *Harris v. State*, 986 S.W.2d 619, 625 (Tex. App–Tyler 1997, pet. ref'd).  The special person essentially stands in the shoes of the corporation.  So, any loss proven as to the corporation is also a loss proven to the special person alleged in the indictment.  *See, e.g., Ray v. State*, 106 S.W.3d 299, 301 (Tex. App.–Houston [1st Dist.] 2003, no pet.).

In *Simpson*, the court held that the proof was at variance with the indictment because, even though the indictment alleged special ownership in a person, there was no testimony showing that person had a greater right to possession of the stolen property.  *See Simpson*, 648 S.W.2d at 2.  Here, by contrast, there was testimony proving that Aguirre had a greater right to possession of the Durango than Washington. Aguirre testified that he had the right to take the cars out for test drives without any supervision or special permission from the dealership; he testified that this was the normal course of business for salespersons at Ed Payne Motors.  Washington, however, was not allowed to take cars out for test drives without permission; rather, it was required that she be accompanied at all times by a salesperson or other employee of Ed Payne Motors.  Based on this testimony, we conclude that Aguirre had a greater right to possession than Washington, and we overrule Washington's fifth and sixth issues in so far as they relate to her fatal variance argument.

[7]  Even though the State was not required to prove that Washington actually deprived Aguirre of the Durango, the State was nonetheless required to prove that Washington appropriated the Durango, which required a showing that Washington "acquire[d] or otherwise exercise[d] control over [the] property."  *See* TEX. PENAL CODE ANN. § 31.01(4)(B).  However, Washington does not challenge whether the State proved the element of appropriation so we need not address it here.

Regardless, we find the following evidence in the record supporting a finding of loss: an exhibit demonstrating that the original sale price of the Durango was $38,549.00; testimony that the Durango was resold for $24,900.00 when Washington returned the vehicle to Ed Payne Motors after only three months use; testimony that the Durango—purchased new only three months earlier—was returned to Ed Payne Motors in a state of serious disrepair; testimony that the difference between the original price and re-sale price was roughly $12,000.00; testimony that, after subtracting the add-ons and down payment from Washington, the actual loss to the dealership was roughly $7,500.00.

Washington argues in her brief that the testimony regarding loss was conclusory. She contends that, because there was no testimony on dealer mark-ups, fair market values, sales commissions, and rebates, there was insufficient evidence to prove that $7,500.00 was a major loss. However, Washington provides no authority, and we find none, in support of her argument that such testimony is needed.

Based on this evidence and reviewing the record in a light most favorable to conviction, we conclude that a rational jury could have found this amount to be the loss of a major portion of value or enjoyment to Aguirre, who was standing in the shoes of Ed Payne Motors. *See King*, 174 S.W.3d at 811; *see also Thomas v. State*, No. 13-00-157-CR, 2001 WL 34389007, at *3 (Tex. App.–Corpus Christi Aug. 23, 2001, no pet.) (holding that the victim lost a major portion of the value of her car where the defendant drove it for seven months and returned it in a damaged condition). The evidence of loss was, therefore, legally sufficient, and we overrule Washington's fifth and sixth issues.

Moreover, we conclude that the evidence was factually sufficient. Absent any contrary evidence in the record, we will not substitute our judgment for that of the jury, which made its own decision at trial regarding the credibility of the witnesses and weighing of the evidence, and cannot conclude that the verdict was clearly wrong or manifestly unjust. *See King*, 29 S.W.3d at 563. We find no objective basis in the record to hold that the Durango was not permanently withheld from Aguirre or that a major portion of the value or enjoyment of the Durango was not lost to Aguirre. *See Watson*, 204 S.W.3d at 414-15. Washington's fourth issue is overruled.

## CONCLUSION

We affirm.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 16th day of July, 2009.